**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| KALLOM LETTSOME, as Personal Representative of the Estate of DeJuan Allen, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:17-cv-04202-TWP-MPB |
| UNITED STATES POSTAL SERVICE, and UNITED STATES OF AMERICA, | ) ) ) | |
| Defendants. | ) ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants the United States Postal Service ("USPS") and the United States of America ("United States") (collectively, "Defendants") (Filing No. 57). Plaintiff Kallom Lettsome ("Lettsome"), as personal representative of the estate of DeJuan Allen ("Allen"), filed this lawsuit against the Defendants after Allen was tragically killed as the result of injuries sustained when a USPS hydraulic "all-purpose container unloader" collapsed on him. Lettsome asserted a single negligence claim for: (1) Defendants not providing Allen with a safety video prior to working on the equipment; (2) Defendants not providing Allen with lock-out/tag-out safety procedures, safety manuals, or instructions prior to working on the equipment; (3) Defendants' failure to warn Allen of the risk of the equipment falling on him; (4) Defendants' failure to have someone in the vicinity while Allen was working on the equipment; (5) Defendants' failure to monitor or maintain security cameras in the room where Allen worked on the equipment; and (6) Defendants' failure to check on Allen (Filing No. 1 at 5).

The Defendants filed a Motion for Summary Judgment, asserting that: (1) Lettsome cannot establish the elements of negligence under Indiana law; (2) Allen's accident was caused at least in part by his employer, Pirtek's, failure to adequately train him; (3) Lettsome's allegations relating to the use and monitoring of security cameras are barred by the discretionary function exception to liability under the Federal Tort Claims Act; and (4) Allen's contributory fault bars Lettsome from recovering (Filing No. 58 at 21). For the following reasons, the Court **grants** the Defendants' Motion.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Lettsome as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Innovative Hydraulics Solutions, LLC, doing business as Pirtek Perry ("Pirtek"), is a franchisee of Pirtek USA, LLC. Pirtek provides hydraulic service and repairs to a broad range of customers in the construction and industrial manufacturing sectors (Filing No. 58 at 3–4). Pirtek advertises itself as a specialist in hydraulic services and repairs. *Id.* This includes repairing all-purpose container unloaders ("APCU"), which are machines that use hydraulic power to raise, tilt, and dump pallets of packages onto a conveyor belt. *Id.* at 2. Allen began working for Pirtek around August 2014, and he worked as a mobile sales and service technician. His job responsibilities included making on-site service calls at customer locations to perform repairs on hydraulic equipment. *Id.* at 4–5. On the day of the accident giving rise to this litigation, Allen had worked at Pirtek for approximately ninety-six days. *Id.* at 5.

Allen received safety training in hydraulics from his employer, Pirtek. This training included lock-out and tag-out procedures, which are used to place a lock-out device on an energy-isolating device in order to secure the device in a position that prevents energization of a machine. The training also included information on utilizing blocks, jacks, and bracing when working on hydraulic equipment. *Id.*

Under Pirtek's standard training process in effect in 2014, Pirtek technicians were issued a manual titled "Safety at Work/Hydraulic Safety." ([Filing No. 58 at 6](#).) The manual advised technicians about the risks of "getting caught in a machine or between objects," and then instructed technicians to "[t]urn off and lock out machinery when making repairs, trouble-shooting, or performing maintenance." *Id.* The manual warned technicians that "anyone who works on hydraulic machinery must be aware of the potential hazards involved," which "can result in serious injury and sometimes death." *Id.* The manual stated that, before working on any hydraulic circuit, the technician must "[e]nsure [he] ha[s] a thorough knowledge of the subject." *Id.* at 7. The manual stated that a technician must "[i]solate the circuit before working on it." *Id.* The manual also stated that a technician must "[e]nsure all safety chocks and anti-slip devices are fully in place BEFORE disconnecting any hose assemblies." *Id.* Under the section titled, "General Safety Rules," the manual instructed technicians, "DO NOT UNDER ANY CIRCUMSTANCES LEAVE, OR WORK ON, A MACHINE WITH THE IMPLEMENTS RAISED, AND/OR UNSUPPORTED." *Id.* Under the "General Safety Rules" section, the manual also instructed technicians, "Do not move any machinery or equipment, this must be done by the customer[']s trained staff." *Id.* The manual also had a section titled "Service Call Procedures," which stated that technicians are "never [to] work with other equipment suspended above [them]." *Id.* at 7–8.

Pirtek's training process also involved issuing technicians documents regarding lock-out/tag-out procedures. The lock-out/tag-out documents instructed technicians that the procedures must be used when dealing with hydraulic energy. The lock-out/tag-out procedures required technicians to "[k]now what lock-out/tag-out procedures to use on each machine you work with." (Filing No. 58 at 8.) The procedures also specified that when working on hydraulic systems, "[a]dditional precautions should be taken to prevent major moving part[s] from slipping," and instructed technicians to "[i]nstall blocks, brackets, or pins when conducting repairs." *Id.*

Sean Cornwell ("Cornwell"), Pirtek's operations manager at the time of the accident in question, completed assessments of Allen's performance during his training. In a training module completed on August 7, 2014, Cornwell rated Allen's ability to assess a new environment for safety hazards as "fair" and noted Allen needed to "look at all surroundings." Pirtek provided Allen with lock-out and tag-out equipment and issued him a lock-out/tag-out kit. Pirtek also supplied its technicians, including Allen, with blockage equipment and jacks. *Id.* at 5–6.

Around October 2014, Allen went to the USPS facility located on Tempelhof Drive in Indianapolis, Indiana, to solicit business for Pirtek. Allen had previously performed repairs on hydraulic equipment, including APCUs. *Id.* at 8–9. During this visit, Allen spoke with two USPS employees, Kathleen Cowan ("Cowan") and Greg Shearer ("Shearer"). Allen reported that Pirtek was a hydraulics specialty company and it serviced and repaired all kinds of hydraulic equipment. He indicated he had extensive experience working on APCUs and that he worked on them "all the time" and there was "no dumper [he couldn't] work on." *Id.* at 9. During the visit, Allen was shown the USPS APCUs and other hydraulic equipment, and he left his business card with Shearer. *Id.*

On November 15, 2014, in response to a call from Shearer, Allen was dispatched to the Tempelhof Drive USPS facility to repair a hydraulic leak on an APCU. Shearer did not specifically

ask for Allen, or any particular technician, to perform the repair. At approximately 8:00 a.m., Allen arrived at the Tempelhof Drive USPS facility and a USPS employee, Brenda Davis ("Davis"), greeted him at the Mail Processing Annex 1 ("MPA 1"). The Tempelhof Drive USPS facility is comprised of two buildings: MPA 1 and Mail Processing Annex 2 ("MPA 2"). MPA 2 is across the street from MPA 1. Allen had been dispatched to repair an APCU located in MPA 2, so Davis escorted Allen to the APCU in MPA 2 (Filing No. 58 at 2, 10–11).

Davis asked Allen if he needed anything to perform the repair, and he responded that he only needed to bring in his tools. Davis told Allen she would be across the street in the MPA 1 office and asked Allen to update her periodically on his progress. Allen had the office number saved to his cell phone and said he would use his cell phone to check in. Davis went back to MPA 1 to attend to other work, and Allen was left to repair the APCU. When Davis left Allen, the APCU's load enclosure was at ground level. Allen raised the APCU's load enclosure into an elevated position and then positioned himself underneath the APCU to repair the hydraulic hose. Allen did not place supports or braces under the APCU before getting under it, and he did not lock-out or tag-out the APCU. While Allen was working on the APCU, the load enclosure fell on him, trapping him underneath. *Id.* at 11–14.

Shortly after 10:00 a.m., Davis came back to MPA 2 to check on Allen. Davis found Allen trapped underneath the APCU, and he was covered in hydraulic fluid. Davis called 911. Once emergency personnel arrived, the APCU was powered down and locked out. The fire department personnel provided blocks and used the USPS forklift to raise the enclosure and extract Allen. Allen was transported to the hospital. Tragically, the following day, November 16, 2014, Allen died from injuries sustained from the accident. *Id.* at 14–15.

There are security cameras in the Tempelhof Drive USPS facility. The USPS uses closed-circuit television ("CCTV") systems to protect its employees, mail, and postal assets and to monitor automated mail flow operations. The purpose of CCTV is to provide visual verification in conjunction with intrusion detection devices or exit alarms and doors equipped with exit alarms or access control devices. CCTV systems are to function as crime deterrents and to record evidence of crime if it occurs. CCTV systems are not installed to view work areas to evaluate the performance of employees. The USPS personnel with access to the cameras determine when and how to monitor the CCTV cameras. *Id.* at 16–18.

Professional Engineer William E. Dickinson, ("Dickinson") of Wolf Technical Services, Inc., undertook an investigation and authored a mechanical engineering expert report. After reviewing records and inspecting the APCU, Dickinson opined that Allen failed to follow Pirtek's lock-out/tag-out procedures and general safety procedures while repairing the APCU. Dickinson opined that Allen had sufficient room to perform the hydraulic maintenance and repair with the enclosure in the down position, thereby never requiring Allen to be underneath the enclosure. Dickinson further opined that Allen's actions showed that he was unfamiliar with the maintenance and repair of the APCU; Allen raised the enclosure of the APCU from the position in which he found the unit, creating a hazardous condition to work on the hydraulic system of the APCU. Dickinson concluded that after Allen raised the enclosure, he failed to properly support or brace the weight of the enclosure in its elevated position, resulting in the storage of dangerous unsupported potential energy in the hydraulic system. The only action that could have prevented the enclosure from lowering from the position to which Allen raised it would have been the utilization of cribbing or braces that would have physically supported the weight of the enclosure in its raised position. Dickinson opined that, as a trained and qualified hydraulic repair contractor,

Allen needed to bring with him all of the tools necessary to complete the repair in a safe manner, including blocking, bracing, or jacks. Further, Dickinson opined that Allen was in the act of loosening a hydraulic fitting on the ninety-degree tilt cylinder and releasing the unsupported energy in the hydraulic system when the enclosure began to lower as hydraulic oil escaped via the fitting connection. In Dickinson's expert opinion, had Allen not raised the enclosure, or if he had properly supported the weight of the enclosure, or not loosened the hydraulic fitting, releasing stored potential energy, the enclosure would have never lowered, and the accident not would have occurred. *Id.* at 18–20.

## II.   SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hemsworth v. Quotesmith, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).

"The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that the a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim" *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.   DISCUSSION

As an initial matter, the Defendants assert that the USPS is not a proper party in this Federal Tort Claims Act ("FTCA") case. "The only proper defendant in an FTCA action is the United States." *Jackson v. Kotter*, 541 F.3d 688, 693 (7th Cir. 2008); *Hughes v. United States*, 701 F.2d 56, 58 (7th Cir. 1982) ("Under the Federal Tort Claims Act, a governmental agency cannot be sued in its own name; the action must be brought against the United States."). In his Response Brief, Lettsome "agrees that the Postal Service, as a governmental agency in this Federal Tort Claims Act action is properly dismissed as a defendant." (Filing No. 59 at 10.) Lettsome agrees and the law is in the USPS's favor. The Court **grants** summary judgment to the USPS and **dismisses** it as a defendant in this action.

The Defendants argue summary judgment is appropriate on Lettsome's negligence claim, contending: (1) Lettsome cannot establish the negligence elements under Indiana law; (2) the United States is not liable for Pirtek's failure to properly train Allen; (3) Lettsome's theory

regarding the CCTV cameras is barred by the discretionary function exception to the FTCA; and (4) Allen's contributory fault bars the claim (Filing No. 58 at 21). The Defendants also ask the Court to exclude certain evidence presented by Lettsome. The Court will address the evidentiary issues first and then turn to the Motion for Summary Judgment.

## A.     Defendants' Request to Exclude Evidence

In Lettsome's response to the Defendants' Motion for Summary Judgment, he provides forty-nine "additional facts" but does not dispute any of the evidence or facts designated by the Defendants (*see* Filing No. 59 at 1–8). In their Reply Brief, the Defendants ask the Court to exclude several of Lettsome's additional facts under the Federal Rules of Evidence.

### 1.     Lettsome's Additional Fact 5

In Lettsome's Response Brief, he asserts that "[g]reeting contractors now includes showing contractors videos that they would see about the [Postal Service] processing center, where they were going, and the equipment they would be working on." (Filing No. 59 at 2.) The Defendants ask the Court to exclude this evidence under Federal Rule of Evidence 407, which provides that "subsequent remedial measures taken after an event which, if taken previously, would have made the event less likely to occur, are not admissible to prove negligence." The fact that the Tempelhof Drive USPS facility now trains its employees to show contractors a safety video is a subsequent remedial measure. Under Rule 407, this is inadmissible; therefore, the Defendants' request to exclude this "additional fact" is **granted**.

### 2.     Lettsome's Additional Fact 6

In Lettsome's response, he asserts that, "on November 15, 2014, Davis did not *know there was* a video to show contractors as DeJuan Allen was the very first maintenance outside contractor that she had ever handled." *Id.* (emphasis added). The Defendants argue that this fact is not

supported by the cited evidence. Instead, Davis said that she "didn't know *if there was* a video to show contractors." ([Filing No. 59-1 at 7](#) (emphasis added).) The Court agrees with the Defendants' assessment of the evidence, and thus, the Defendant's request to exclude Lettsome's "additional fact 6" is **granted**.

### 3.  **Lettsome's Additional Fact 7**

Lettsome asserts, "Since the time that Davis failed to show the training video to DeJuan Allen, she has show[n] the contractor safety video to ten other contractors." ([Filing No. 59 at 2](#).) The Defendants ask the Court to exclude this evidence as a subsequent remedial measure under Rule 407. For the same reason stated above, the Defendants' request to exclude this "additional fact" is **granted**.

### 4.  **Lettsome's Additional Fact 8**

In his Response Brief, Lettsome notes that "[t]he contractor video for those performing maintenance work lasts about ten to fifteen minutes and, as a requirement, the contractor has to watch the video before they can enter the facility." *Id.* The Defendants request this be excluded under Rule 407 because it is another subsequent remedial measure, and thus, is inadmissible. The Defendants' request is well-taken, and this evidence is **excluded**.

### 5.  **Lettsome's Additional Fact 12**

Lettsome notes that "Davis' supervisor and trainer was Greg Shearer, and he left that morning before DeJuan Allen showed up. Shearer just told Davis "we have a contractor coming in. Bring him in, get him signed in and take him to P2, and show him the equipment." *Id.* at 3. The Defendants argue that this fact is inadmissible hearsay to the extent it is offered for the truth of the matter asserted. The Court concludes that, at this stage of the litigation, these facts need not be

excluded and the Court may consider this evidence to show why Shearer did what he did, and not for the truth of the matter asserted, so the Court **denies** the request to exclude this "additional fact."

6. **Lettsome's Additional Fact 14**

In Lettsome's Response Brief, he asserts, "Davis also did not give Allen a contractor packet like all the other contractors received because she was unaware of the contractor packet." *Id.* at 3. The Defendants ask the Court to exclude this fact because Davis did not testify as to what the procedures were before Allen's accident, and she did not testify that there were procedures before the accident. Instead, Lettsome relies on the processes that Davis testified occurred after the accident. The Defendants again argue this is inadmissible subsequent remedial measures under Rule 407. The Court agrees, and the Defendants' request to exclude this fact is **granted** because the assertion is not supported by the evidence and also is inadmissible under Rule 407.

7. **Lettsome's Additional Facts 19 and 20**

In his response, Lettsome included that "Davis became aware of the contractor packet existence after the incident. She received an email that all maintenance personnel were supposed to be trained on handling contractors. So, she attended a class and watched the contractor's video." (Filing No. 59 at 4.) Furthermore, "All contractors that Davis has ever handled since the incident received a contractor packet, and she showed them the safety video." *Id.* The Defendants ask the Court to exclude these facts under Rule 407 as subsequent remedial measures. The request again is well-taken, so the Court **excludes** "additional facts" 19 and 20.

8. **Lettsome's Additional Facts 28–31, 38, and 40–42**

The Defendants argue that these additional facts concerning USPS's lock-out/tag-out procedures are "inconsequential" because "William Dickinson, Defendants' expert, opined that locking and tagging out the equipment would not have prevented the accident. Once Mr. Allen

unnecessarily raised the enclosure, the only action that could have prevented the accident was Mr. Allen properly blocking and bracing the enclosure before he crawled underneath it." ([Filing No. 60 at 4](#) (internal citations omitted).) The Court concludes that, at this stage of the litigation, these facts need not be excluded because the Defendants' argument goes more to the weight to be given the evidence rather than the admissibility of the evidence.

### 9. **Lettsome's Additional Fact 37**

Relying on Davis' deposition testimony, Lettsome asserts that a "sign that says 'Danger. Use lockout device before maintenance or any operator adjustment,' would not have been visible to Allen because the sign was flat against the floor." ([Filing No. 59 at 6](#).) The Defendants assert that this fact is inaccurate and not supported by Davis' deposition testimony because she further explained that Allen must have raised the enclosure, and when it was raised, the "danger" sign would have been visible to Allen. The deposition testimony supports Lettsome's assertion as well as the additional facts noted by the Defendants in their Reply Brief. Therefore, the Court will not exclude Lettsome's "additional fact" 37, but it will also consider the facts noted by the Defendants.

### 10. **Lettsome's Additional Fact 39**

Lettsome asserts that "Davis shows the contractor video and provides the contractor safety packet to the outside contractors, and she does not expect them to ask to see the video or safety packet. Rather, she presents the video and safety packet to them." *Id.* The Defendants argue this should be excluded because it is yet another example of a subsequent remedial measure that is not admissible pursuant to Rule 407. They further argue there is no evidence that showing the video to Allen would have prevented his accident, and the video is not in evidence. From the context within which Lettsome offers this additional fact, it appears to be another subsequent remedial

measure to argue that the Defendants were negligent. As such, the Court **grants** the Defendants' request to exclude this fact.

### 11. <u>Lettsome's Additional Fact 44</u>

In his Response Brief, Lettsome notes, "Subsequent to the incident, Harley learned that there is a requirement at the postal service for outside contractors to watch a safety video." *Id.* at 7. The Defendants argue, "Ian Harley's testimony concerning what he was told about the requirements for contractors before Mr. Allen's accident is an out-of-court statement made by unidentified persons and, thus, inadmissible to prove the truth of the matter asserted in the statement." (Filing No. 60 at 5.) The Defendants' argument concerning this hearsay evidence is well-taken; thus, the Court **grants** their request to exclude this fact.

### 12. <u>Lettsome's Additional Facts 46 and 49</u>

Lettsome asserts that Ian Harley testified, when Pirtek provides services in a production or factory environment, the clients take care of the lock-out/tag-out process, and the clients' maintenance personnel are present during the repair and maintenance. The Defendants argue these facts should be excluded because Ian Harley testified he had only "third-hand" experience working with hydraulics, people worked for him to provide the technical service, he was not active in Pirtek's daily business in November 2014, and he rarely went out on service calls. Thus, the Defendants argue, Ian Harley lacks the personal knowledge necessary to testify about the practices and procedures of other customers in factory environments and maintenance departments, and his testimony is merely speculation. At this stage of the litigation, the Court concludes that these facts need not be excluded because there is at least some foundation that Ian Harley would have personal knowledge about these facts, so it appears that his testimony is not solely speculation.

**B.**     **Motion for Summary Judgment**

Lettsome argues the United States is liable for Allen's accident that resulted in his death. He alleges six ways in which the United States was negligent: (1) it did not provide Allen with a safety video; (2) it did not provide Allen with lock-out/tag-out procedures, safety manuals, or instructions for the APCU; (3) it did not warn Allen of the risks of the APCU falling on him; (4) it did not have someone in the general area while Allen was working on the APCU; (5) it did not monitor or maintain the security cameras in MPA 2; and (6) it did not check on Allen while he performed the repair. The Defendants argue they are entitled to summary judgment because Lettsome cannot recover under any of these theories.

Under Indiana law, to sustain an action for negligence Lettsome must establish: (1) a duty owed by the United States to conform its conduct to a standard of care arising from its relationship with Allen; (2) a breach of that duty by the United States; and (3) an injury to Allen proximately caused by the breach of that duty. *See St. John Town Bd. v. Lambert*, 725 N.E.2d 507, 514 (Ind. Ct. App. 2000). The Defendants contend that the United States did not owe a duty to Allen as an independent contractor. Whether the United States breached a duty and whether the breach proximately caused Allen's injuries generally are questions for the trier of fact. However, the existence of a duty is a question of law for the Court. *Id.*

Generally, "the owner of property is under no duty to provide an independent contractor with a safe place to work, but there is a duty to keep the property in a reasonably safe condition." *Ozinga Transp. Sys. v. Michigan Ash Sales*, 676 N.E.2d 379, 384 (Ind. Ct. App. 1997). A landowner is liable for "reasonably foreseeable injuries to a contractor's employee caused by hazardous instrumentalities maintained by the landowner on the landowner's premises." *Zawacki v. U.S.X.*, 750 N.E.2d 410, 414 (Ind. Ct. App. 2001) (citations omitted). This duty extends to

independent contractors. *Bethlehem Steel Corp. v. Lohman*, 661 N.E.2d 554, 556 (Ind. Ct. App. 1995). Indiana has adopted the Restatement (Second) of Tort's definition of premises liability as it relates to landowners' liability to business invitees. *See Podemski v. Praxair, Inc.*, 87 N.E.3d 540, 547 (Ind. Ct. App. 2017). The Restatement states,

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> > (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> >
> > (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> >
> > (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343. The Restatement also provides,

> A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

*Id.* at §343A(1).

In light of Indiana's adoption of the Restatement (Second) of Torts, the Defendants argue that the comparative knowledge of Allen and the USPS does not support holding the United States liable. The Defendants contend that Lettsome has provided no evidence that the USPS knew of any latent dangers posed by the APCU or had superior knowledge to that of Pirtek and Allen concerning the dangers posed by crawling underneath the unsupported APCU while repairing it. Further, Defendants contend the evidence indicates that Allen had superior knowledge about the process of performing hydraulic repairs and the dangers implicit in working on large hydraulic systems.

The Defendants did not specify the method or means for repairing the APCU, and, as Lettsome alleges, no USPS employees were present when Allen performed the work. Pirtek provided the training, equipment, and safety equipment to Allen to complete the repair. The undisputed evidence shows that Allen should have been able to reach and repair the hydraulic hose when the APCU was left in the down position, and the APCU was on the ground when Davis left Allen. The USPS did not specify the means by which the task of repairing the APCU should have been accomplished. Allen had control of the site, and it was only when Allen lifted the APCU off the ground that it became unsafe.

The Defendants contend that, even if Allen was unable to complete the repair with the enclosure in the down position, his training from Pirtek instructed him to brace and block out equipment when raising it, and Pirtek's training prohibited him from working under raised or unsupported implements. The Defendants argue they could not have anticipated Allen would disregard his training and would crawl underneath the raised and unsupported enclosure. They assert that since Allen chose the specific manner in which he performed the work, which ultimately caused his injuries, they did not have superior knowledge to Allen or Pirtek, and thus, they cannot be liable under the Restatement's and Indiana's premises liability law. The Defendants argue they cannot be liable for the known risks arising from the very reason why Allen was on the premises—namely to fix the APCU. Allen knew the risks associated with repairing the APCU. They note that Allen held himself out as being qualified to fix it, and was trained by Pirtek on how to repair the APCU and protect against the risks associated with the repair.

Lettsome did not directly address or respond to the Defendants' argument concerning premises liability, instead, he discussed "non-delegable" duties, which is addressed below. The Court concludes that the Defendants' argument concerning premises liability is supported by good

case law and is established by the designated evidence. The owner of property generally is under no duty to provide an independent contractor with a safe place to work. The property owner is subject to liability only if the harm is caused by a condition on the land that is known (or should have been known) and that involves an unreasonable risk of harm to others, and the property owner should expect that others will not discover or realize the danger or will fail to protect themselves against the danger. Additionally, there is no liability where the activity to be performed or the condition on the land presents a danger that is known or obvious. The evidence shows that Pirtek and Allen presented themselves to the USPS as experts in repairing hydraulic equipment, including APCUs. They understood the risks associated with such repairs as Pirtek provided training and equipment to its technicians to protect against these very risks. The general rule that property owners owe no duty to provide an independent contractor with a safe place to work and the Restatement's and Indiana's rule against premises liability apply in this case, and the Defendants are entitled to summary judgment on this basis.

In his Response Brief, Lettsome asserts certain "non-delegable" duties exist that give rise to the Defendants' liability in this case. Lettsome acknowledges the general rule that a general contractor is not liable for the negligence of a subcontractor, and he asserts that this general rule is based on the rationale that the general contractor typically exercises little control over the means or manner of the work of its subcontractors. However, Lettsome argues, certain exceptions to this general rule exist, thereby creating "non-delegable" duties:

> (1) where the contract requires the performance of work intrinsically dangerous;
> (2) where a party is by law or contract charged with the specific duty;
> (3) where the act will create a nuisance;
> (4) where the act to be performed will probably cause injury to others unless due precaution is taken to avoid harm;
> (5) where the act to be performed is illegal.

*Perry v. Northern Ind. Pub. Serv. Co.*, 433 N.E.2d 44, 47 (Ind. Ct. App. 1982).

Lettsome contends that two exceptions apply in this case: where the contractor requires the performance of work that is intrinsically dangerous, and where the act to be performed will probably cause injury to others unless due precaution is taken to avoid harm.

"Intrinsically dangerous" work means that "the danger exists in doing the activity regardless of the method used. It is a risk intrinsic to the accomplishment of the task and not simply a danger arising from a casual or collateral negligence of others." *Cummings v. Hoosier Maine Properties, Inc.*, 363 N.E.2d 1266, 1275 (Ind. Ct. App. 1977). Here, the Defendants contend that the undisputed evidence shows that repairing the APCU could have been done safely. Lettsome has not provided any evidence contrary to the Defendants' expert testimony that repairing the APCU could have been done safely with the load enclosure flat on the ground. Additionally, the evidence shows the repair could have been done safely if Allen had followed his training and used braces or jacks to safely secure the raised APCU before repairing it. The evidence in this case shows that the risk of danger only developed when Allen departed from the method Pirtek trained him to use. The Defendants argue as a result, the "intrinsically dangerous" exception to the general rule of no liability on the part of the general contractor does not apply in this case.

In order for the other exception—where the act to be performed will probably cause injury to others unless due precaution is taken to avoid harm—to apply, "at the time of the making of the contract, a principal should have foreseen that the performance of the work or the conditions under which it was to be performed would, absent precautionary measures, probably cause injury." *Bagley v. Insight Commc'ns Co.*, 658 N.E.2d 584, 588 (Ind. 1995). The danger that the principal must foresee must be substantially similar to the accident that caused the injury. *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 857 (Ind. 1999). "[M]ore than the *possibility* of harm is required;

the defendant should have foreseen the *probability* of such harm." *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1267 (Ind. Ct. App. 2002) (emphasis in original).

The Defendants note that the USPS contacted Pirtek to repair the APCU only after Allen solicited business at the Tempelhof Drive facility and held himself and Pirtek out as hydraulic experts with experience repairing APCUs. The United States could not have foreseen that Allen would be oblivious to the danger of the unsupported APCU enclosure falling on him or would fail to take precautions, such as bracing or blocking out the enclosure before crawling underneath it, to protect himself from that danger.

The Defendants' arguments concerning the two "non-delegable" duty exceptions relied upon by Lettsome are well-taken. The evidence shows there were safe means and methods to repair the APCU, thereby eliminating the "intrinsically dangerous" theory advanced by Lettsome. Additionally, at the time that the USPS contacted Pirtek to perform work on the APCU, the USPS could not have foreseen that Allen would disregard his training and climb under the raised APCU without first placing braces, blocks, or jacks to secure the APCU. Thus, the "due precaution" exception does not apply here. As a result, Lettsome cannot avoid summary judgment by relying on the "non-delegable" duties exception to the general rule that a contractor is not liable for the negligence of a subcontractor.

Lettsome additionally argues that the USPS was negligent in failing to use its CCTV security cameras in MPA 2 when Allen was working there alone. The Defendants argue that this theory is barred by the discretionary function exception to the FTCA, which excludes "any claim . . . based on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or government employee, whether or not the discretion be abused." 28 U.S.C. § 2680(a). For the discretionary function exception to the FTCA

to apply, two factors must be met. "First, a discretionary act must be involved. In other words, the act for which liability is sought to be imposed must involve 'an element of judgment or choice.'" *Calderon v. United States*, 123 F.3d 947, 949 (7th Cir. 1997). Second, the judgment must be "of the kind that the discretionary function exception was designed to shield." *Id.* The exception serves to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).

The Defendants argue that federal regulations give the Chief Postal Inspector and the local Postmasters' broad discretion in making security decisions, and while there were CCTV cameras at the Tempelhof Drive facility, the cameras were to be used only for limited investigative, security, and administrative purposes. The cameras were not used to monitor the activity of employees at the facility. Only specific USPS personnel with access to the cameras had authority to decide how and when to use the cameras, and that decision was based on investigative need, security and privacy concerns, budgetary constraints, and resource and staffing considerations. No statutes or regulations mandated how the cameras were to be used. Thus, the Defendants argue, these determinations regarding the use or monitoring of the CCTV cameras are discretionary in nature as they involve elements of judgment or choice unconstrained by statutory or regulatory directive.

The Defendants argue the second factor is also met for the discretionary function exception to apply. The exception is designed to protect against judicial second-guessing of administrative decisions grounded in social, economic, and policy reasons. The manner in which the United States secures and monitors its USPS facilities and allocates resources is an administrative decision based

on policy and economic considerations. Therefore, the Defendants assert, the second factor is satisfied, and the discretionary function exception to the FTCA applies to bar Lettsome's claim.

Lettsome responds that Davis, the only USPS employee present when Allen arrived at the facility to repair to the APCU, admitted she did not activate the cameras nor understood how the cameras and the surveillance system worked. Lettsome argues Davis and the USPS were not engaged in a discretionary act in not using the surveillance cameras. Davis never considered activating the surveillance cameras for Allen's protection, and she cannot exercise discretion if she never considers the possibility. Furthermore, Lettsome asserts, there is no evidence of policy judgment occurring on the morning of November 15, 2014, when the accident occurred.

The Court concludes that Lettsome's argument is unavailing in opposing the application of the discretionary function exception. The evidence shows that the USPS used judgment to decide to use its CCTV cameras only for specific investigative, security, and administrative purposes, not to monitor the work of employees in the facility. The USPS determined how and when to utilize its CCTV cameras based on policy considerations of investigative need, security and privacy concerns, budgetary constraints, and resource and staffing matters. And the evidence suggests this decision is not made by all USPS employees but only by specific USPS personnel who have authority to use the cameras. That Davis did not consider using the cameras on November 15, 2014, to monitor Allen while he worked does not remove from the discretionary function exception the USPS's policy decision of when to use its security cameras. Furthermore, Lettsome does not present any evidence suggesting that the failure to use the CCTV cameras proximately caused Allen's injuries. Instead, Lettsome presents only speculation and conjecture, and this cannot "defeat a summary judgment motion." *Dorsey*, 507 F.3d at 627.

Finally, the Defendants argue they are entitled to summary judgment because Allen's contributory fault bars recovery. Because of the Court's conclusions discussed above that the Defendants are entitled to summary judgment, the Court declines to address this final argument from the Defendants.

## IV.    CONCLUSION

While Allen's accident was a tragedy, for the reasons discussed above, the Defendants are entitled to summary judgment in their favor. Therefore, the Court **GRANTS** the Defendants' Motion for Summary Judgment (Filing No. 57), and Lettsome's claim for negligence is **dismissed**. The trial and final pretrial conference are hereby **vacated**. Final judgment will issue under separate order.

**SO ORDERED.**

Date:    3/31/2020

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jackson Taylor Kirklin
UNITED STATES ATTORNEY'S OFFICE
taylor.kirklin@usdoj.gov

Michael Brian Langford
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
mlangford@scopelitis.com

Gina M. Shields
UNITED STATES ATTORNEY'S OFFICE
Gina.Shields@usdoj.gov